## BURR *v.* UNITED STATES (No. 28).[1]

CONCRETE MUGUET DE MAI—ENFLEURAGE GREASE.

    Muguet de Mai, shown by a preponderance of testimony to contain no essential oil, is not fluorescence valley lily, but enfleurage grease, and as such by paragraph 626, tariff act of 1897, was not dutiable.—United States *v.* Ungerer (T. D. 28210) distinguished.

### United States Court of Customs Appeals, January 5, 1911.

APPEAL from a decision of the Board of United States General Appraisers (T. D. 28448). Transferred from United States Circuit Court for the Southern District of New York.
[Reversed.]
*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellant.
*D. Frank Lloyd*, Assistant Attorney General (*Charles Duane Baker* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

HUNT, Judge, delivered the opinion of the court:

This case involves the proper classification of certain merchandise which was invoiced as "Concrete Muguet de Mai." The collector

---

[1] Reported in T. D. 31183 (20 Treas. Dec., 17).

at New York regarded the article as within a combination of oils, and assessed duty at 25 per cent ad valorem, under paragraph 3 of the act of July 24, 1897, which reads as follows:

Alkalies, alkaloids, distilled oils, essential oils, expressed oils, rendered oils, and all combinations of the foregoing,· * * * twenty-five per centum ad valorem.

The importer contended that the merchandise was entitled to free entry under paragraph 626 of the tariff act referred to, which admits "enfleurage grease" free of duty.

After a hearing the Board of General Appraisers overruled the protest of the importer and sustained the action of the collector. The board based its ruling upon the ground that the merchandise was in all essential particulars the same as the "fluorescence valley lily," which was involved in the case of United States *v.* Ungerer reported in T. D. 28210, wherein the Circuit Court for the Southern District of New York held that fluorescence valley lily was liable to duty at the rate of 25 per cent ad valorem under the hereinbefore quoted provisions of paragraph 3 of the tariff act of 1897. The importers ask a reversal of the decision of the Board of General Appraisers.

The testimony of the importer, who is a dealer in perfume, but who is not a chemist, is to the effect that the article under consideration is manufactured by what is known as the volatile solvent process, whereby the odoriferous principle from the flowers is taken out; that muguet de Mai is a combination of such odors alone; that an essential oil is the product of the process of distillation, but that none of the ingredients which enter into muguet de Mai are produced by a process of distillation. The witness said, however, that an essential oil could be produced by expression, and cited as an instance of essential oil attar of roses. Witness said that the concrete muguet de Mai is a combination of lily of the valley odor, which, in turn, is a combination of lily or lily of the valley and muguet odors; that there are as many as five flowers used in the combination; that he has two odors, May lily and muguet de Mai, one liquid and the other solid; that in the one case the solvent is made by taking out the inert vegetable waxy matter, and in the other the odoriferous principles are extracted with a much smaller percentage of the inert vegetable matter. Witness described the volatile solvent process as in its first development involving the use of "one solvent used with all petroleum ether," but as this process has developed combinations by other solvents than petroleum ether have been made, which, he said, had become necessary because the characters of the different flowers vary, and it is desirable to obtain all the odoriferous principle of each flower in as perfect condition as possible. He said that the volatile solvent process differs from the enfleurage in that the enfleurage is what is termed "fixed

solvent process;" that in the manufacture of muguet de Mai each of the odors is manufactured by the volatile solvent process from the bloom of the flowers. He described how the odor of the rose is obtained by the volatile solvent process, saying:

The rose is put in the volatile solvent, the bloom. This is put in the volatile solvent exactly as it is put in the fixed solvent, put bodily into the fixed solvent. The volatile solvent takes out the odoriferous principles of the rose as does the fixed solvent. Then the solvent is odorized * * * taken off.

He said that in the process a retort is used, with vacuum pressure, and the article imported is the accumulation; that the products of the fixed solvent and volatile solvent process, finished, are practically the same, in so far as the odor is concerned; that their liquid flower essences, made by the fixed solvent, are practically of the same character as the essence in the liquid form; that the fixed solvent process embraces not only animal grease, but vegetable oils, which are used as fixed solvents for the mixture of odors from the flower. In another part of his testimony the witness repeated that none of the odors in the muguet de Mai under examination were made by distillation, but that he could not say at what point the combination of different odors entered, but that from his understanding, during the process of making the odors, principally of the rose, upon reaching a certain stage of development the partially finished material is put together, thus creating a second stage of the process, and that then they are carried along through the machine until the muguet is produced; that the process was virtually one.

The importers called Mr. Crane, a professional chemist of years of experience in the perfume industry and the preparation of synthetics or bodies made from other bodies for use in the perfume industry. This witness said he had made analytical tests of the merchandise involved in this investigation for the purpose of ascertaining whether the soluble portion contained essential oils, but that he found none were present. Witness said that he took a portion of the filtered alcoholic solution and examined it in a tube of 100 millimeters in lenth in a polariscope. He found a rotation of approximately one degree; then he removed the alcohol from another portion of the alcohol soluble material, dissolved the residue in ether shaken with a water solution of potassium hydrate, and treated the water layer with acid to neutralization, and as a result he found no appreciable quantities of phenolic bodies liberated; that there were practically no terpenes present, although essential oils nearly always contain a fairly large proportion of terpenes or phenolic bodies. Witness found between 5 and 6 per cent of grease which was entirely saturated with the odoriferous principle of flowers. He took the contents of a bottle which had been used in the case of Ungerer v.

United States, heretofore referred to, and found no appreciable quantity of grease present, upon a test made by dissolving in alcohol and chilled.

It was the opinion of the witness that the merchandise called fluorescence valley lily, involved in the Ungerer case (supra), was not of the same physical characteristic as the concrete muguet de Mai involved herein, the difference between them being in specific gravity, in mobility, color, and composition. One, said the witness, contains fat, the other does not; and he believed that the muguet de Mai was enfleurage grease, because it is a grease or greasy body containing the odoriferous constituents of flowers. It was also the opinion of Mr. Crane that essential oils usually are free from fat, and more mobile and more fluid in character than the muguet de Mai. He defined an essential oil under a trade definition as "a body derived from a vegetable source by expression, direct distillation, or steam distillation," saying that the portion of the vegetable which contains the oil is expressed, and thus essential oil is given.

Upon being asked what was the point, if any, at which a mixture ceases to be an essential oil, he said that he did not know that an essential oil would ever lose its character; that if you took a whole lemon and squeezed it and simply allowed the resulting liquid to stand, pure oil of lemon would come floating to the top and lemon juice would be beneath, and you could remove the essential oil of lemon by skimming it off, but that he would not call a mechanical separation a process of refinement. He said that sometimes in obtaining essential oils the process of distillation or expression contributes to the formation of essential oil; that the mother substance is always present in the original vegetable matter, but that essential oil is something obtained from the plant tissues by the process employed. It was Dr. Crane's opinion that some essential oils were purer than others, each oil having its own test; that it was hard to say what essential oil was in a popular sense, but that commercially it is the result of distilling odoriferous bodies, and that as used in the perfumery trade, an essential oil must be either expressed or distilled.

Theodore Ricksecker, an expert perfume manufacturer, had testified in the Ungerer case. It was agreed that his testimony in that case should be received as evidence in this case. He defined enfleurage grease as a vehicle of grease that absorbs odors, odoriferous principles, and said "the grease may be solid or liquid or any way, so long as it is enfleurage, which means saturated with flowers." This witness said he was the author of the title in the tariff of 1897, and that prior to 1897 as a commercial term enfleurage grease was applied

to pomade, which was made of odoriferous grease impregnated with the odoriferous principles of flowers, and sold in the different markets of the world to be extracted by alcohol; that after the extraction by alcohol of the odor, the residue would cease to be enfleurage grease. He explained that enfleurage grease was the term merely applied to the vehicle combined with the impregnation of the odors before the manufacturing of the combinations commenced; that generally the material out of which enfleurage grease is made is anhydrous lard. The manufacture was by spreading a thin layer of anhydrous lard on a glass tray, then by putting a layer of flowers, and then another layer of fat, and another layer of flowers; that they were then allowed to remain until the fat had absorbed the perfume, and that when the perfume was exhausted, the flowers were taken out and another application of flowers was had, and that this was repeated until the desired strength of enfleurage grease was obtained. He said that the resulting combination of the fragment part of the flower and this grease was what is known as enfleurage grease.

He described the fluorescence valley lily involved in the Ungerer suit as containing several ingredients advanced beyond the state of enfleurage grease, and that he believed the article contained ylang-ylang, and had nothing to do with enfleurage grease. Witness said, however, that he did not make enfleurage grease himself, but he was familiar with the use of it in the manufacture of perfumery. Owing to some uncertainty of determining just what exhibit witness had before him when he testified, we are unable to understand fully the references of the witness to the greases and oils in sample, but we take it he meant to have it accepted as his opinion that the bottle in the Ungerer case contained a combination of enfleurage grease, with probably a little oil to strengthen it, and that it would be more correct to say that article was a combination of greases and oils than to say that it was a manufacture of enfleurage greases and oils.

D. J. Booth, a chemist of many years' experience, and whose testimony in the Ungerer case was used, said that enfleurage grease was made as Mr. Ricksecker had described it. He added that the grease was washed with alcohol, and that when that washing was concluded, it ceased to be enfleurage grease, and carried the essential odors of the flowers. He said there was another process called the solvent process, where the odors of the flowers were dissolved out by the volatile solvent—ether; that evaporation off into a lower temperature occurs in using this process, and thus a concrete is constituted, which is fortified by ylang-ylang and linanol. Ylang-ylang and linanol, witness said, are obtained by distillation. Witness admitted, however, that no absolute test could be made unless analysis was had.

The evidence of the importer is not altogether clear, but we are impressed by the testimony of Dr. Crane, which is reasonable and is not contradicted in any material respect. Particular stress must also be given to his statement to the effect that the fluorescence valley lily which was involved in the Ungerer case is, in the essential particulars named by him, different from the concrete muguet de Mai to which inquiry in this case is addressed. Nor is there any real conflict between Dr. Crane and Mr. Ricksecker in the specific descriptions of what constitutes enfleurage grease. Both say it is a grease saturated with flowers, that it may be solid or liquid, and that it is a grease or greasy body which contains the odoriferous constituents of flowers.

.These gentlemen may have differed in their more general deductions with respect to the character of the respective articles testified to by them, yet when we consider that Dr. Crane was a technical expert, and stated his premises and reasons from an apparently accurate standpoint, and advanced his opinion upon careful analysis of the particular article involved in this suit, and that his analysis was not disputed by any chemist, we are disposed to believe that it gave to the importers that decided weight of evidence which permitted of no sound conclusion other than that their protest as to the muguet de Mai was well founded. We gather, too, that an enfleurage grease does not necessarily lose its character, although it is a mixture of several greases, bearing odors of flowers, provided, of course, the grease remains a crude product which can only be used when imported by washing or treatment which will get out of it the odor principles of flowers. Pickhardt *v.* Merritt (132 U. S., 257); United States *v.* Brownell (166 Fed. Rep., 1022); United States *v.* Schering (163 Fed. Rep., 246); United States *v.* Morningstar (168 Fed. Rep., 541).

Some decisions of the courts and rulings of the Treasury Department are cited by counsel for the Government, but inasmuch as they relate to articles of different composition, they are not directly relevant.

Our judgment is that, under the weight of uncontradicted evidence, the article involved in the Ungerer case is not essentially similar to that involved herein, and that therefore the record does not present an instance of a mere conflict of evidence as to a question of fact. We have then a fact established by expert analysis not inherently false or unworthy of belief.

It follows that the basis of comparison used by the board was inaccurately employed, and that their conclusion must be set aside as without sufficient evidence to sustain it.

*Reversed.*